**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

CHE ERNEST HAZELL,                       )
                                         )
     Petitioner,                       )
                                         )
v.                                       )     Civil Action No. 3:22-cv-77–HEH
                                         )
LARRY EDMONDS,                           )
                                         )
     Respondent.                       )

**MEMORANDUM OPINION**
**(Granting Motion to Dismiss)**

Che Ernest Hazell, a Virginia state prisoner proceeding with counsel, brings this

petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 6) challenging his

convictions in the Circuit Court for the City of Virginia Beach, Virginia ("Circuit

Court"). Hazell argues that he is entitled to relief on the following grounds:[1]

Claim One:    "The trial court erred when it admitted unsworn and incompetent
testimony. The testimony provided by [Hazell's] daughter Dacia
was unsworn and incompetent. Dacia was interrogated by
Virginia Beach Child Protective Services with no parent or
guardian present." (*Id.* at 6.)

Claim Two:    "Trial counsel was ineffective. Trial counsel rendered deficient
performance when he failed to advise Mr. Hazell of the
maximum sentence that could be imposed on him should Mr.
Hazell decide not to take the state's plea offer." (*Id.* at 8.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system for citations to
the parties' submissions. The Court corrects the spelling, punctuation, capitalization, and
spacing in the quotations from the parties' submissions.

Respondent moves to dismiss because the § 2254 Petition is untimely and barred by the statute of limitations. (ECF No. 23.)[2] Hazell filed a Response (ECF No. 16), Respondent filed a Supplemental Brief in Support (ECF No. 18), and as directed by the Court, Hazell later filed supporting documents for his actual innocence claim. (ECF No. 21.)[3] For the reasons set forth below, Respondent's Motion to Dismiss (ECF No. 23) will be granted, and the § 2254 Petition will be denied as untimely.

## I.   PROCEDURAL HISTORY

After a bench trial, Hazell was convicted of child cruelty, child neglect, and second-degree felony murder by child abuse and neglect. (*See* ECF No. 24-1 at 1; ECF No. 24-2 at 5.)[4] On August 28, 2012, Hazell was sentenced to a total of forty years of incarceration. (ECF No. 24-1 at 1–2.)

Hazell appealed his convictions, arguing that "the evidence was insufficient to support his convictions because his evidence was more credible than that of the Commonwealth and the evidence failed to prove he knew or had reason to know the extent of the victim's injuries." (ECF No. 24-2 at 5.) On August 7, 2013, the Court of

---

[2] By Memorandum Order entered on November 21, 2022, the Court denied the Motion to Dismiss without prejudice and directed Respondent to file an amended response that comported with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. (ECF No. 22.) Respondent has complied with that directive and filed an Amended Motion to Dismiss. (ECF No. 24.)

[3] Hazell has litigated this case in a disorganized manner, as described in further detail in Part III.B.1.

[4] Hazell's girlfriend, Christy Lamour, who was also the victim's mother, was tried jointly with Hazell.

2

Appeals of Virginia denied Hazell's petition for appeal. (*Id.*) In rejecting Hazell's

sufficiency of the evidence arguments, the Court of Appeals of Virginia found:

> On the morning of Sunday, April 3, 2011, five-year-old C.L. was living with his mother, Christy Lamour, his sister, Lea Lamour, [Hazell], and [Hazell]'s two children, three-year-old Devin and nine-year-old Dacia Hazell. Lamour, who was under investigation by child protective services, was prohibited from spanking her children. Nevertheless, after C.L. had an altercation with Devin on Friday, April 1, 2011, Lamour spanked C.L.
>
> Although C.L. was five years old, he could not toilet properly and often wore diapers. His toileting mistakes resulted in his being disciplined frequently. On the morning of April 3, 2011, C.L. cleared his plate from the table after breakfast and did not place it in the sink to [Hazell]'s satisfaction. [Hazell] punished him by placing him in a "timeout." For the other children, [Hazell]'s "timeout" consisted of backing up to a wall and remaining in a squatting position for an extended period of time. For C.L., the punishment was modified so that the boy crossed one leg over the other and all of his weight was on one leg. C.L also had to place his hands and arms over his head.
>
> [Hazell] became angry with C.L. when he did not perform the timeout punishment properly. [Hazell]'s daughter, Dacia, testified that [Hazell] grew agitated because C.L. was "wiggling" his finger during the timeout. [Hazell] punched C.L. in the abdomen with a closed fist. C.L. slumped over, put his hands on his belly, and fell to the floor.
>
> Dacia noted that C.L. was punished more frequently than the rest of the children and that he attempted to avoid interaction with [Hazell] by remaining in his room. For example, while [Hazell] wrestled with the other children in a playful manner, he hit and punched C.L. when they wrestled each other. Dacia was the only other family member who observed her father strike C.L. in the stomach on the morning of April 3, 2011.
>
> Shortly after being struck, the boy vomited in the living room. [Hazell] sent him outside to pick up leaves, but Lamour took him back inside after C.L. vomited again and lay down on the ground. C.L. continued vomiting the rest of the day and could not keep fluids down. By that evening, he was in "excruciating" pain and wakened [Hazell] and Lamour several times with his moaning. Lamour gave her son ibuprofen, closed the door to her bedroom, and went back to sleep. She noted his belly was swollen and that her son seemed disoriented. [Hazell] never left his bed.
>
> Lamour left the house early the next morning for work without checking C.L.'s stomach. C.L. had difficulty sitting up under his own strength, and was unable to dress himself. [Hazell] dressed him for the day, but called Lamour at work upon observing that the boy's stomach was

"huge" with swelling. [Hazell] told Lamour to come home and take the child to the hospital. However, he never called 911 or attempted to take the boy to a nearby hospital. By the time Lamour returned home, C.L.'s tongue had begun to turn blue. He died in Lamour's car on the way to the hospital.

Medical personnel attempted unsuccessfully for nearly forty-five minutes to resuscitate C.L. Dr. Abik Biswas observed a bruise on C.L.'s abdomen and noted his belly was distended. Tests performed following C.L.'s death revealed he had a perforated bowel, as well as a bruised and lacerated kidney. His abdominal cavity was filled with fluid and air.

The medical examiner who performed C.L.'s autopsy testified that C.L.'s internal injuries were caused by blunt force trauma and that this trauma was the cause of his death. C.L.'s bowel perforation prevented his body from absorbing fluids, leading to dehydration. C.L. also had bruised on both sides of his abdomen, his back, the back of his thigh, and his left cheek and eye. Both his right and left arms had been fractured within the last two weeks. The medical examiner noted that C.L.'s bruises could not have been inflicted after death.

On the day of C.L.'s death, Dacia spoke with social worker Kelly Cobb and revealed her father had punched C.L. in the stomach. When the authorities interviewed [Hazell], however, he denied having punched C.L. Instead, he admitted only that he pushed the boy the day before his death and then spanked him with a belt five times. After the spanking, he sent C.L. outside to pick up leaves.

Upon being left alone in the interview room, [Hazell] telephoned his father. During the conversation, [Hazell] stated, "I don't remember hitting him but I guess I did." [Hazell] told police he had hit C.L. in the past, but did not recall hitting him on the day before his death. He stated, "I could have [hit him]. I could have, I'm not denying that I probably did but I don't remember it."

Lamour gave several statements to [the] police. Initially, she maintained C.L. was injured when he fell off his bunk bed. Eventually, however, she acknowledged her initial statements were false. She admitted she had spanked C.L. a day or two prior to his death, but she could not recall exactly why or when she had spanked him. Lamour acknowledged appellant became angry with C.L. the morning before his death, pushed him to the ground, and got on top of him. She told [Hazell] he was being "too rough" with C.L. and then went upstairs to read to her daughter. A few minutes later Lamour saw C.L. and [Hazell] go into another upstairs bedroom, and she heard the sound of a belt. Lamour went to her bedroom to rest. [Hazell] joined her shortly thereafter. When she asked [Hazell] why he had spanked C.L., he told her he "couldn't remember . . . why [C.L.] got in trouble." She told police she had seen [Hazell] punch the children on prior occasions, but denied seeing him punch C.L. on the day before his death.

4

At trial, Dr. Suzanne Starling, an expert in child abuse pediatrics, explained the degree of blunt force trauma required to cause abdominal bruising. She noted the abdomen did not bruise as easily as other parts of the body because "there's nothing hard inside it." An abdominal bruise could result only from being struck "very hard" or so deeply that the skin of the belly was ground down to the spine. C.L.'s abdominal bruises consisted of a series of round bruises. In Dr. Starling's opinion, C.L. had to sustain severe, deep blows from a small object in order to sustain the bruises on his belly and back, and to suffer a perforated bowel and lacerated kidney. She also observed that, if a child is lying on the floor at the time of the abdominal trauma, "[i]t's typically actually worse . . . because the child is flat and you can actually get deeper into the belly to cause that injury. If they're standing up, you actually may push them away as you're striking them in the belly." She emphasized that his injuries were treatable and that timely medical attention would have saved his life. She opined that C.L.'s injuries could not have been caused by a fall from a bunk bed.

[Hazell] contends the evidence failed to prove felony murder by child abuse and neglect because it failed to prove beyond a reasonable doubt he was guilty of the underlying felony child abuse and neglect charge. He asserts the Commonwealth did not meet its burden of proof under Code § 18.2–371.1. Specifically, he points out that it failed to prove that his "willful act or omission or refusal to provide for [C.L.]'s health[,] cause[d] or permit[ted] serious injury to [his] life or health . . . ." He also asserts the evidence failed to prove him guilty of felony child cruelty in violation of Code § 40.1–103.[5]

In support of his arguments, [Hazell] maintains reasonable doubt exists as to the cause of C.L.'s injuries because the testimony of his daughter, Dacia, was not credible. Without being specific, he asserts her testimony was "replete with errors." He also points out that Dacia was only nine years old at the time of C.L.'s death and she was angry with her father that weekend because she had been punished with extra math work after receiving a poor grade.

---

[5] Section A of that statute provides as follows:

> It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the life of such child to be endangered or the health of such child to be injured, or willfully or negligently to cause or permit such child to be placed in a situation that its life, health or morals may be endangered, or to cause or permit such child to be overworked, tortured, tormented, mutilated, beaten or cruelly treated. Any person violating this section shall be found guilty of a Class 6 felony.

[Hazell] maintains the evidence failed to prove he struck C.L. or caused the injuries leading to his death. Furthermore, he asserts he was not criminally negligent in his response to the boy's injuries because both he and Lamour testified they did not recognize the serious nature of the injuries until it was too late.

"The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear the evidence as it is presented." *Sandoval v. Commonwealth*, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Marable v. Commonwealth*, 27 Va. App. 505, 509–10, 500 S.E.2d 233, 235 (1998).

Here, [Hazell] and Lamour were tried as co-defendants. Their testimony, coupled with the medical evidence, established that C.L. had been repeatedly beaten over an extended period of time. The couple beat the boy so frequently that they could not even recall why they had struck him during the days prior to his death. [Hazell]'s own daughter testified that [Hazell] punched C.L. in the stomach on the morning prior to his death. While [Hazell] contends her testimony was "replete with errors," she gave the same account to a social worker the day after her half-brother's death. In contrast, [Hazell] and Lamour gave several conflicting accounts to authorities regarding the cause of C.L.'s injuries. Both appellant and Lamour acknowledged, however, that appellant had punched C.L. in the past and that appellant disciplined C.L. more severely than his own children. Finally, because social services had already begun to investigate C.L.'s treatment, the trial court, acting as fact finder, could rationally conclude that [Hazell] and Lamour delayed seeking medical care for him to avoid prosecution, and to reject their testimony that they were unaware that his life or health was in danger.

The evidence was competent, credible, and sufficient to prove beyond a reasonable doubt that [Hazell] was guilty of felony abuse and neglect of a child, felony child cruelty, and felony murder by child abuse and neglect.

(*Id.* at 5–10 (alterations in original) (footnote number changed).) On November 25, 2013, a three-judge panel denied Hazell's petition for rehearing. (ECF No. 24-2 at 1.) On June 9, 2014, the Supreme Court of Virginia refused Hazell's petition for appeal. (ECF No. 24-3 at 22.)

6

On June 15, 2015, Hazell, by counsel, filed a petition for a writ of habeas corpus in the Circuit Court raising various claims of ineffective assistance of counsel. (ECF No. 24-4 at 1, 4–6.) On December 21, 2015, the Circuit Court denied the petition as untimely. (ECF No. 24-5 at 3–6.) Hazell appealed. On January 31, 2017, the Supreme Court of Virginia refused the petition for appeal. (ECF No. 24-6 at 46.)

On February 7, 2022, counsel filed the original § 2254 petition in this case. (ECF No. 1.)[6]

## II.   STATUTE OF LIMITATIONS

### A.   Law Governing Timeliness

Respondent contends that the federal statute of limitations bars Hazell's § 2254 Petition. Section 101 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") amended 28 U.S.C. § 2244 to establish a one-year period of limitation for the filing of a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. Specifically, 28 U.S.C. § 2244(d) now reads:

1.   A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
      (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
      (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if

---

[6] Because the original § 2254 petition was not signed by Hazell as required by Rule 2 of the Rules Governing Section 2254 Cases, the Court directed counsel to file a petition that was signed under penalty of perjury by Hazell. (ECF No. 5.) Counsel complied with that directive. (ECF No. 6.)

the applicant was prevented from filing by such State action;

**(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

2. The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

### B.   Commencement and Running of the Statute of Limitations

The Supreme Court of Virginia refused Hazell's petition for appeal on June 9, 2014. Under federal law, Hazell's convictions became final on Monday, September 9, 2014, when the time to file a petition for a writ of certiorari expired. *See Hill v. Braxton*, 277 F.3d 701, 704 (4th Cir. 2002) ("[T]he one-year limitation period begins running when direct review of the state conviction is completed or when the time for seeking direct review has expired . . . ." (citing 28 U.S.C. § 2244(d)(1)(A))); Sup. Ct. R. 13(1) (requiring that a petition for certiorari should be filed within ninety days of entry of judgment by the state court of last resort or of the order denying discretionary review). The one-year limitation period for filing his § 2254 Petition then expired on Monday, September 9, 2015.

### C.   Hazell Is Not Entitled to Statutory Tolling

To qualify for statutory tolling, an action must be a (1) properly filed (2) post-conviction or other collateral review of (3) the pertinent judgment. 28 U.S.C. § 2244(d)(2). "[A]n application is 'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). These rules and laws "usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." *Id.* (footnote omitted) (citations omitted).

Although Hazell filed his petition for writ of habeas corpus in the Circuit Court on June 15, 2015, that court found it untimely because it was filed more than a year after his conviction became final under state law. (*See* ECF No. 24-5 at 3–6.) Thus, it was not properly filed under state law, and Hazell lacks entitlement to any statutory tolling. *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) ("When a postconviction petition is untimely under state law, 'that [is] the end of the matter' for the purposes of § 2244(d)(2).")

Hazell failed to file his § 2254 Petition until February 7, 2022, nearly five years after the limitation period expired. Hazell does not suggest any plausible basis for a belated commencement of the limitation period under 28 U.S.C. § 2244(d)(1)(B)–(D). Instead, Hazell argues that he is entitled to equitable tolling and that his actual innocence excuses his failure to file in a timely manner.

### D.   Hazell is not Entitled to Equitable Tolling

The Supreme Court has "made clear that a 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that

9

some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace*, 544 U.S. at 418). An inmate asserting equitable tolling "bears a strong burden to show specific facts" that demonstrate he fulfills both elements of the test. *Yang v. Archuleta*, 525 F.3d 925, 928 (10th Cir. 2008) (quoting *Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008)). To make the requisite showing of diligence, the petitioner "must allege with specificity the steps he took to diligently pursue his federal claims." *Id.* at 929–30 (10th Cir. 2008) (emphasis added).

In his § 2254 Petition, Hazell argues as follows:

> First, Petitioner is actually innocent. Second, and most importantly, [P]etitioner is entitled to equitable tolling as he has been diligently pursuing his rights by filing motions for post-conviction relief and a request for [a] pardon from the Virginia Governor. Petitioner's former counsel was ineffective in many respects including preserving his post-conviction rights. Nevertheless, Petitioner has remained diligent.

(ECF No. 6 at 14.) In his response to the Motion to Dismiss, Hazell contends, once again, that because he pursued post-judgment avenues in the state and applied for a pardon "[t]his is a clear attempt to remain diligent in pursuing his freedom." (ECF No. 16 at 2.) Hazell also suggests that "[t]his petition would be timely were it not for an extraordinary error of counsel which resulted in Hazell's petition being filed a day late." (ECF No. 7 at 12.) Hazell's arguments for equitable tolling are vague, lack any precision, and lack any factual detail. *See San Martin v. McNeil*, 633 F.3d 1257, 1268 (11th Cir. 2011) (citations omitted) ("Mere conclusory allegations are insufficient to raise

the issue of equitable tolling."). In the end, it is evident that Hazell fails to demonstrate
any entitlement to equitable tolling.

First, Hazell has failed to show that he exercised diligence in protecting his rights.
*See Holland*, 560 U.S. at 649. Hazell argues that he was pursuing post-judgment relief in
the state and then sought a pardon from the Governor. However, Hazell's pursuit of
relief in state court ended on January 31, 2017, when the Supreme Court of Virginia
refused the petition for appeal of his habeas petition. (ECF No. 24-6 at 46.) Hazell fails
to identify with the requisite specificity what actions, if any, he took to pursue his claim
in the days between January 31, 2017, and February 7, 2022.[7] Five years of inaction
alone forecloses Hazell's entitlement to equitable tolling. *Yang*, 525 F.3d at 930 (citation
omitted); *Roberts v. Watson*, 697 F. Supp. 2d 646, 653 (E.D. Va. 2010) ("Unexplained
delays in filing petitions do not demonstrate diligence on the part of petitioner in pursuing
his rights" (citing *Pace*, 544 U.S. at 419; *Spencer v. Sutton*, 239 F.3d 626, 630 (4th Cir.
2001))).

Second, Hazell fails to allege, must less demonstrate, the existence of an
extraordinary circumstance that prevented him from timely filing his § 2254 Petition. At
most, Hazell claims that "[t]his petition would be timely were it not for an extraordinary
error of counsel which resulted in Hazell's petition being filed a day late" and "any

---

[7] Although Hazell vaguely suggests he was pursuing a pardon from the Governor of the
Commonwealth of Virginia, he fails to provide dates or any specific information about his
efforts. At most, he cites to the Pardon Application, but has failed to submit a copy of it. (*See*
ECF No. 7 at 12.) Moreover, the simple fact that he was seeking a pardon from the Governor
hardly shows that he was diligent pursuing his federal rights and is not an extraordinary
circumstance that prevented him from filing a § 2254 Petition.

improper or late state PCR filing is the result of former counsel's ineffectiveness." (ECF No. 7 at 12.) It is unclear what Hazell means by "[t]his petition." (*Id.*) Although Hazell's argument again lacks precision, the Court believes that Hazell faults counsel for filing Hazell's state habeas petition in the Circuit Court one day late and argues that the mistake should permit the untimely filing of his § 2254 Petition. The Court fails to discern how this has any bearing on the equitable tolling inquiry. A "mistake by a party's counsel in interpreting the statute of limitations does not present the extraordinary circumstance beyond the party's control" that would permit equitable tolling. *Harris v. Hutchinson*, 209 F.3d 352, 330–31 (2000); *see Rouse v. Lee*, 339 F.3d 238, 248–51 (2003) (explaining that errors of counsel are not circumstances external to the party's own conduct and do not warrant equitable tolling). Moreover, as explained above, Hazell's state court habeas proceedings were concluded by January 31, 2017, and yet Hazell did not file his § 2254 Petition for another five years.[8] Any error in timing by his state habeas counsel is certainly not an extraordinary circumstance that prevented him from timely filing his § 2254 Petition.

In sum, Hazell has failed to demonstrate that he is entitled to equitable tolling of the limitation period.

---

[8] To the extent that Hazell suggests that the only reason that his § 2254 Petition is untimely is because his state habeas petition was untimely and did not afford him any statutory tolling, this argument is entirely incorrect. Hazell's state habeas proceedings concluded on January 31, 2017. Hazell did not file his § 2254 Petition for another five years.

## III.   ACTUAL INNOCENCE

### A.   Law for Actual Innocence to Excuse Untimeliness

The Supreme Court has recognized actual innocence as a basis for overcoming the expiration of the statute of limitations. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (explaining that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations"). "Claims of actual innocence, whether presented as freestanding ones or merely as gateways to excuse a procedural default, should not be granted casually." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted). Here, the Court reviews Hazell's arguments under the more lenient standard for gateway actual innocence claims because subscribing to Hazell's actual innocence allegations would permit the Court to consider the merits of his otherwise time-barred habeas petition.

A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'" and determines whether the petitioner has met the standard for a gateway claim of

13

innocence. *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327–28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327–28). "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." *Hill v. Johnson*, No. 3:09cv659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352–53 (8th Cir. 1997); *Feaster v. Beshears*, 56 F. Supp. 2d 600, 610 (D. Md. 1999)). Moreover, actual innocence means factual innocence and not just legal insufficiency. *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (citation omitted).

As discussed in greater detail below, despite Hazell's characterization of his submitted evidence as "new," it is neither new nor reliable evidence of his innocence.

## B.    Hazell's "New" Evidence of Innocence

The Court notes that Hazell's main argument for timeliness is that he is entitled to equitable tolling. However, as discussed previously, that argument is unavailing. As a secondary argument, Hazell contends that he is actually innocent. (*See* ECF No. 6 at 15) ("First, Petitioner is actually innocent. Second, and most importantly, petitioner is entitled to equitable tolling").

In their initial response, Respondent correctly asserted that Hazell had not supported his claim of actual innocence with any new, reliable evidence of his innocence. Specifically, Respondent argued that Hazell referenced a "2014 Affidavit" and a "June 2021 Affidavit" (*see* ECF No. 7 at 7–9, 15–16, 19), but Hazell failed to attach those

14

affidavits to his petition as exhibits. Hazell also referenced a preliminary hearing

transcript, but failed to proffer it, and failed to attach medical records or an autopsy report

on which he relied for his actual innocence argument. (*See* ECF No. 14 at 9 n.2.)

Thereafter, Hazell filed his response with a copy of one page of the autopsy report

attached. (ECF Nos. 16, 16-1.)

> By Memorandum Order dated June 30, 2022, the Court warned Hazell that:
>
> Gateway claims require the petitioner to come forward with actual evidence of his or innocence, not mere allegations that evidence of his or her innocence exists. *See Shelton v. Dir. of Dep't of Corr.*, No. 3:09cv270, 2009 WL 790013, at *5 (E.D. Va. Mar. 23, 2009) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352–53 (8th Cir. 1997)). Conclusory, unsubstantiated allegations of innocence are hardly the sort of new reliable evidence described by the Supreme Court." *See Schlup v. Delo*, 513 U.S. 298, 324 (1995).

(ECF No. 20 at 2.) Therefore, the Court directed Hazell "to file with the Court any

evidence of his innocence on which he intends to rely. This includes any transcripts not

on file with the Court." (*Id.*)

On July 7, 2022, Hazell finally filed the following three exhibits to support his

innocence without any further explanation: 1) Hazell's July 31, 2014 Affidavit; 2)

Hazell's June 27, 2021 Affidavit; and 3) the autopsy report for C.L. (ECF No. 21.)[9]  The

Court addresses each of these in turn.

---

[9] Notably, Hazell still has not produced some of the evidence that he suggested was "new" in his Response to the Motion to Dismiss. Hazell has not produced a preliminary hearing transcript with statements from Mr. Hazell's mother, Detective Swasey, or Christy Lamour that Hazell alleged "entirely absolve Mr. Hazell of any wrongdoing." (ECF No. 16 at 4.) Although Hazell cites to a June 2021 preliminary hearing transcript, the preliminary hearing appears to have been held on July 12, 2011, and on August 30, 2011 (*see* ECF No. 24 at 14), and those transcripts were available and were filed in the Court of Appeals of Virginia and the Supreme Court of Virginia.

### 1.    Hazell's July 31, 2014 Affidavit

Hazell executed an affidavit on July 31, 2014, ten days after the Supreme Court of Virginia dismissed his appeal. (ECF No. 21-1.) Hazell eventually submitted this affidavit with his state habeas petition. Because of its length, the Court summarizes relevant portions as it relates to his stated actual innocence arguments. In this affidavit, Hazell provides his own chronology of the weekend before the victim's death, attempts to blame the victim's injuries on anyone or anything but himself, and then complains about his counsel's performance. Hazell testified at trial and his affidavit is largely duplicative of that trial testimony and of other testimony elicited during trial, including how Christian may have injured himself around the house or falling from a bunkbed, that he and Lamour both spanked the victim around the time he became ill, and about how he and Lamour believed that Christian had a stomach virus. (*Id.* at 2–3.)

The remainder of the affidavit is comprised of Hazell recounting his beliefs concerning his counsel's performance throughout his criminal proceedings. Hazell also clearly intends to place the blame for Christian's death solely on his girlfriend, Lamour. For example, Hazell insists that his "back injury and hand measurements that proved it impossible for me to cause injuries." (*Id.* at 6.) Hazell also contends that the testimony at trial indicated that "the size of object that caused injury she gave [sic] a small blunt object the size of a small orange" and that his "hands are the size of grapefruits and my co-defendant['s] hands would be the size of small oranges." (*Id.*) Hazell also highlights his girlfriend's past "abusive relationship with the victim." (*Id.* at 7.)

16

### 2.    Hazell's June 27, 2021 Affidavit

Hazell also proffers his own affidavit from June 27, 2021.  (ECF No. 21-2.)  This second affidavit is comprised of Hazell's continued arguments about his counsel's alleged deficiencies at trial and why his trial attorney was ineffective for not obtaining a variety of records.  For example, Hazell contends that:  "Dacia Hazell was interviewed by Virginia Beach Child Protective Services (CPS) at Portsmouth Naval Hospital with no parent or guardian present.  In her testimony, she stated that she was coached what to say and no full transcript of [an] interview with CPS was ever given."  (*Id.* at 1.)  Hazell also, once again, provides a variety of his unsupported theories about how the victim became injured.  Hazell also faults the prosecutor and his attorney because they "failed to present [the] victim's medical records which prove the victim died of pre-existing conditions as he had symptoms of digestive issues that cause[d] some perforations or holes in lower intestines that led to death."  (*Id.*)  Hazell insists that "[m]issing medical records and lab reports that show evidence of sickle cell anemia and digestive diseases if presented would prove my innocence. [The a]utopsy report stated unknown foreign fluid found in [the] victim's lower intestines suggests [that the] victim ingested something as [the] victim had been caught drinking contact solution weeks prior."  (*Id.* at 4–5.)

### 3.    Autopsy Report

Hazell also filed a "Report of Investigation" and "Report of Autopsy" completed after the victim's death and before trial.  (ECF No. 21-3.)  At most, Hazell suggests that the autopsy report supports his claim of innocence because "the initial television reports correctly state that Christian ingested chemicals, which is confirmed by the autopsy

17

reports. Moreover, Dr. Biswas testified that the physical injury, including the bruising, was caused post-mortem." (ECF No. 16 at 5 (citations omitted).) Clearly, the autopsy report was available at the time of trial and Hazell had many opportunities to make his arguments about the contents.

The Circuit Court record demonstrates that the preliminary autopsy report, autopsy photographs, and final autopsy report were provided to Hazell in discovery more than once. *See* Commonwealth's Resp. to Mot. for Disc. and Inspection, *Commonwealth v. Hazell*, No. CR11–3257, at 1–2 (Va. Cir. Ct. filed Dec. 29, 2011); Commonwealth's Resp. to Order for Disc. and Inspection, *Hazell*, No. CR11–3257 (Va. Cir. Ct. filed May 24, 2011); Commonwealth's Suppl. Resp. to Order for Disc. and Inspection, *Hazell*, No. CR11–3257 (Va. Cir. Ct. filed June 20, 2011). The medical examiner who performed the autopsy testified about the autopsy report at the preliminary hearing. (July 12, 2011 Tr. at 14–15.) The autopsy report was also introduced at trial and was used extensively during the medical testimony. (*See, e.g.*, Apr. 30, 2012 Tr. at 314.) Thus, the autopsy report is clearly not "new" evidence for the purposes of the actual innocence inquiry.

## C.    The Credibility of Hazell's Evidence

The Supreme Court has explained that to be viable, three types of "new reliable evidence" may support a petitioner's allegations of innocence. *Schlup*, 513 U.S. at 324. These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* Simply put, Hazell's actual innocence claim is not accompanied by any of the three categories of evidence required to support an actual innocence claim. Rather, as discussed below, instead of

18

providing new evidence, Hazell wishes for the Court to reevaluate the evidence of his guilt. That is not the role of this Court in an actual innocence inquiry.

First, Hazell's affidavits are self-serving, are not trustworthy, and do not constitute the sort of "new reliable evidence" described by the Supreme Court. *See Schlup*, 513 U.S. at 324; *Perry v. Virginia*, No. 3:13CV327–HEH, 2013 WL 4590619, at *4 (E.D. Va. Aug. 28, 2013) (concluding that defendant's post-conviction declaration of innocence could not support a claim of actual innocence); *McGivery v. Johnson*, No. 3:10CV455–HEH, 2011 WL 1838874, at *5 (E.D. Va. May 13, 2011).  To accept such commonplace self-serving statements and declarations of innocence would ignore the Supreme Court's admonition that the quality of evidence required to support a claim of actual innocence "is obviously unavailable in the vast majority of cases." *Schlup*, 513 U.S. at 324; *see Calderon*, 523 U.S. at 559 (emphasizing that new reliable evidence of innocence is a "rarity").  Hazell also testified at trial and the information he provides in his affidavits is largely duplicative of his trial testimony that the Circuit Court found incredible and based on other theories counsel attempted to advance at trial that the Circuit Court found were not supported by the evidence.  Thus, Hazell's affidavits fail to qualify as new reliable evidence of his innocence.

With respect to the autopsy report, Hazell fails to explain why this report is "new" or amounts to "exculpatory scientific evidence" or "critical physical evidence" not presented at trial, as it was indeed, not only introduced at trial but relied upon extensively. *Schlup*, 513 U.S. at 324.  Hazell also fails to adequately explain why it is exculpatory.  At most, he indicates that the autopsy report shows that the victim had

ingested chemicals or that the bruising occurred post-mortem. Neither the Court, nor Hazell, is an expert qualified to review an autopsy report and second-guess the cause of death beyond what the medical examiner concluded. In sum, Hazell has not met his burden of producing new reliable evidence of his innocence. Thus, the Court need not proceed to the second part of the inquiry for Hazell's gateway actual innocence claim, and for this reason alone Hazell fails to demonstrate that his actual innocence excuses the untimeliness of his § 2254 Petition. *See Hill*, 2010 WL 5476755, at *5 (citing *Weeks*, 119 F.3d at 1352–53; *Feaster*, 56 F. Supp. 2d at 610).

### D.    All of the Evidence

Even if the Court ignores the obvious fact that Hazell's claim of innocence does not stem from "new reliable evidence," the Court cannot find that in light of all the evidence, no reasonable juror would have found Hazell guilty beyond a reasonable doubt. Rather, the Circuit Court serving as factfinder weighed the exact evidence and found Hazell guilty.

Hazell's arguments of his innocence appear to be two-fold. First, Hazell argues that his girlfriend, Christy Lamour, should have been the only individual convicted of the victim's death. Second, Hazell seems to suggest that the autopsy report, combined with his statements, show that the victim had ingested chemicals and that the physical injury including the bruising occurred after the victim's death. As explained previously, the Circuit Court was presented with all of the evidence Hazell relies upon in his § 2254 Petition and found that Hazell was guilty beyond a reasonable doubt.

With respect to Hazell's arguments about the cause of death of the victim, there was simply no evidence to support Hazell's theory that the victim's cause of death was from ingesting chemicals. Indeed, a post-mortem toxicology test established that there were no "tested drugs" found in the victim's system. (Apr. 30, 2022 Tr. at 347–48.) Rather, it was abundantly clear that the victim died from blunt force trauma imposed by Hazell, and then subsequent neglect. Four medical experts opined that the victim had suffered abdominal trauma including bowel perforation. (Apr. 25, 2012 Tr. at 37, 112–13; Apr. 30, 2012 Tr. at 360, 392.) The medical examiner concluded that the cause of death "was due to the perforated small bowel as a result of blunt force abdominal trauma." (Apr. 30, 2012 Tr. at 360.) Two medical experts explained that a perforated bowel could be repaired by emergency surgery. (Apr. 25, 2012 Tr. at 112–13; Apr. 30, 2012 Tr. at 392.) The victim was exhibiting symptoms consistent with a perforated small bowel, including extensive vomiting for more than eighteen hours, complaining of abdominal pain, having visible abdominal swelling, and exhibiting strange behavior such as lying on the floor, wandering the house overnight, and sleeping in the bathtub. (*See, e.g.,* Apr. 30, 2012 Tr. at 394–99, 432–33, 491–95, 522–24). However, the overwhelming and uncontroverted evidence established that Hazell and Lamour ignored the victim's obvious and serious distress for eighteen hours and until it was too late to save the victim.

The evidence also established that the victim's abdominal injuries, including the perforated bowel, were caused by a sharp, hard blow to his stomach with something like a fist. (Apr. 30, 2012 Tr. at 371–72, 435–36.) Hazell's daughter testified that she

observed Hazell punch the victim in the stomach and the victim double over in pain. (Apr. 25, 2012 Tr. at 153.) This testimony was consistent with her statement to a social worker on the day of the victim's death. (Apr. 30, 2012 Tr. at 484.) Although Hazell argues that the victim's cause of death could be from an array of other potential injuries, the medical experts explained that a perforated bowel could not be caused by falling in the house, falling off a bunkbed, roughhousing, being spanked, or from CPR. (Apr. 30, 2012 Tr. at 371–72, 378–79; 415–20, 424, 426, 437.) The Circuit Court, relying on the consistent opinions of medical experts, found Hazell's theories of the victim's death unsupported by the evidence and simply incredible.

Next, Hazell makes much of the disparity in testimony about whether bruises could appear post-mortem. Dr. Biswas, the emergency room doctor who treated the victim, testified that bruises could become apparent after death and that a person could be bruised after death. (Apr. 25, 2012 Tr. at 62–63, 66.) However, two medical experts, including the medical examiner who performed the autopsy, very clearly testified that bruises could not appear post-mortem and explained in detail why that could not occur. (Apr. 30, 2022 Tr. at 328, 450–51.) Dr. Starling, a medical expert on pediatric child abuse, was asked specifically about Dr. Biswas's statement about bruising and indicated that she "would be surprised" that a doctor would testify that way, because it was a "fact" that bruises could not appear post-mortem. (Apr. 30, 2012 Tr. at 450–51.) Nevertheless, even if bruises could appear post-mortem, Hazell fails to explain how this would have any impact on the very consistent medical opinions that the victim died from a perforated bowel caused by blunt force trauma and had been exhibiting very serious outward

22

symptoms of a perforated bowel for many hours before Hazell and Lamour sought

medical attention. Simply put, the victim's cause of death was not chemicals nor was it

some invented and unsubstantiated post-mortem injury.

Finally, Hazell attempts to place the blame for the victim's injuries that led to his

death solely on Lamour. Hazell argues that Lamour had spanked the victim before he

became ill and that she had been reported to CPS previously. In short, there was no

evidence put forth at trial that Lamour engaged in any physical contact with the victim

that could have caused his abdominal injuries. Rather, the evidence demonstrated that

Hazell punched the victim in the stomach, which caused the perforated bowel. However,

both Hazell and Lamour shared blame for the victim's death by ignoring his very extreme

symptoms and not seeking medical attention until it was too late. The Circuit Court

recognized this, and both Hazell and Lamour were convicted of child neglect, child

cruelty, and second-degree felony murder. (Apr. 30, 2012 Tr. at 627–29.)

The Circuit Court judge, who was extremely engaged throughout the trial,

explained that:

> I have . . . over fifty pages of notes. . . . I looked at the pictures carefully.
> I've looked at the autopsy report.
>     This case is about the death of [the victim]. He's a five-year-old child
> who died as a result of an atrocious and outrageous crime. The evidence in
> this case reveals indicators of long term abuse, that there were specific
> injuries as charged on the dates of the indictments that led to his untimely
> death on April the 4th, 2011. This court finds that the child, . . . , was severely
> beaten and died as a result of the beatings and the withholding of medical
> care. The child was severely injured by the defendant, Che Hazell, on April
> 3rd, 2011. The defendant, Christy Lamour, was present for all or part of the
> time that these injuries were inflicted. Based upon the evidence produced,
> including the statements of the defendants, it's obvious to the court that the

23

> child was critically injured and needed immediate medical attention. Malice is clearly evident in the injuries inflicted on [the victim].
>
> The court finds the testimony of Christy Lamour to lack any credibility whatsoever. The court also finds the testimony of Che Hazell to also lack credibility. The defendants each withheld necessary and essential lifesaving medical care to [the victim] that resulted in the child's death. The defendants, each of them, displayed neglect and a cruel and callous disregard for the wellbeing of the child. The only concern shown by these defendants was for their personal wellbeing. . . .

(Apr. 30, 2012 Tr. at 625–26.) Here, Hazell essentially asks this Court to review the Circuit Court's assessment of the evidence and the determination that neither Hazell nor Lamour were credible witnesses. Although not required under the law, *see Hill*, 2010 WL 5476755, at *5, the Court has reviewed the entire record and finds that overwhelming evidence exists of Hazell's guilt, and that Hazell is not actually innocent.

In sum, given the totality of the evidence, Hazell fails to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Sharpe*, 593 F.3d at 377 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327). Accordingly, Hazell fails to show that his actual innocence excuses the timeliness of his § 2254 Petition. Hazell's § 2254 Petition is untimely and will be denied.

## VI. CONCLUSION

For the foregoing reasons, the Motion to Dismiss (ECF No. 23) will be granted. Hazell's claims will be dismissed, and the § 2254 Petition (ECF No. 6) will be denied. A certificate of appealability will be denied.

An appropriate Final Order shall accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: **Apr: 1 5, 2023**
Richmond, Virginia

25